**UNIGARD SECURITY INSURANCE COMPANY, INC., successor to Unigard Mutual Insurance Company, Inc., Plaintiff,**

v.

**NORTH RIVER INSURANCE COMPANY, Defendant.**

**No. 88 Civ. 0789 (RWS).**

United States District Court, S.D. New York.

April 23, 1991.

Mound, Cotton & Wollan, New York City (Eugene Wollan, Michael H. Goldstein, of counsel), for plaintiff.

Simpson Thacher & Bartlett, New York City (Dennis G. Jacobs, Andrew S. Amer, Robert E. Rice, Mary Beth Forshaw, of counsel), for defendant.

## MODIFIED OPINION
### TABLE OF CONTENTS

Prior Proceedings ............................................................... 571
FINDINGS OF FACT ............................................................. 571
1. The Parties................................................................ 571
2. The Underlying Insurance Involved ........................................ 571
3. The Reinsurance Certificate Issued by Unigard to North River ............. 572
4. The Asbestos Injury Crisis ............................................... 573
 a. Owens–Corning's Situation ............................................ 574
 b. Crum & Forster's Situation ........................................... 574
5. The Wellington Agreement ................................................. 575
 a. The Facility.......................................................... 576
 b. The Indemnity and Expense Percentage Allocation Formulas ............. 576

 c. Confidentiality of the Facility's Data ................................... 577
 d. The Trigger of Insurance Coverage Under the Facility ................. 577
6. The Termination of the Asbestos Claims Facility ........................... 578
7. Reinsurance Claims Handling at Unigard .................................. 578
8. Communications With Respect to the Facility ............................. 579
9. Insurance Industry Custom and Practice .................................. 580
 a. Setting of Reserves ............................................... 580
 i. In general ..................................................... 580
 ii. Excess insurers and reinsurers ................................. 581
 b. Notice ........................................................... 581
 i. To direct insurers ............................................. 581
 ii. To reinsurers ................................................. 581
 c. Reinsurer involvement in claims ..................................... 581
10. North River's Involvement with the Facility .............................. 582
 a. North River's Analysis of Its Exposure ............................... 582
 b. The Aetna Exhaustion ............................................. 582
 c. North River's Response to the Aetna Exhaustion ...................... 583
11. North River's Notice on the Certificate .................................. 584
12. North River's Reserves on XS–3672 ..................................... 584
13. Unigard's Response to the Notice on the Certificate ....................... 585
14. Claims Paid Under XS–3672 ............................................ 585
15. The Costs of Defense ................................................... 586
16. The Stub Period XS–3672(A) ............................................ 586
17. The North Shore Audit ................................................. 586

CONCLUSIONS OF LAW ........................................................ 586

1. Jurisdiction ........................................................... 586
2. Unigard Must Follow the Fortunes of North River on XS–3672 ............. 586
3. North River's Consent to the Wellington Agreement Did Not Implicate
 Any of the Provisions of the Certificate ................................. 587
 a. North River Was Not Required to Issue Notice When It Signed the
 Wellington Agreement ............................................. 588
 b. North River's Failure to Notify Unigard of Its Intent to Sign the
 Wellington Agreement Was Not Intentional ......................... 588
 c. Neither the Producer Allocation Scheme Nor the Use of the Triple
 Trigger Altered the Risk of the Certificate ........................... 589
4. Unigard Cannot Escape Liability on the Grounds of Untimely Notice ....... 590
 a. Notice Was Not Required Prior to March, 1987 ........................ 590
 b. Notice Should Have Been Sent After the Aetna Exhaustion ............ 591
 c. The Timeliness of Notice Must be Judged Under an Objective Standard ..... 591
 d. Under an Objective Test, North River's Notice was Untimely ........... 591
 e. Unigard's Inability to Show Prejudice from North River's Late Notice
 Prevents it From Escaping Liability ................................. 592
 i. The "no prejudice" rule in the insurance context ................... 592
 ii. The different needs of insurers and reinsurers justify applying a
 different rule in the reinsurance context ......................... 592
 iii. Unigard has not shown prejudice from North River's untimely
 notice ....................................................... 593
5. Under the Following Form Clause Unigard Must Pay Expenses in Excess
 of the Limits of the Certificate ........................................ 594
6. Unigard Owes the Full Payment for the Policy Period on XS–3672(A) ....... 595

CONCLUSION ................................................................. 596

SWEET, District Judge.

This diversity action involves a facultative reinsurance certificate (the "Certificate") issued by plaintiff Unigard Security Insurance Company ("Unigard") to defendant North River Insurance Company ("North River"). Unigard seeks a declaratory judgment relieving it of any obligation to indemnify North River for losses paid by North River to its insured Owens–Corning Fiberglass Corporation ("Owens–Corning"). North River by way of counterclaim seeks to recover such indemnification. Based upon the findings of fact and conclusions of law set forth below, judgment will be entered granting relief to North River on its counterclaims in accordance with this opinion.

This action is significant not only because of North River's counterclaim for over $15 million in indemnity and related expenses but also because it raises, apparently for the first time, significant issues concerning reinsurance for losses suffered by a manufacturer of asbestos and its insurer. These issues include the effect upon the "follow the fortunes" and "right to associate" clauses of the Certificate and any Unigard reinsurance obligations of the participation of Owens–Corning and North River in the Asbestos Claims Facility (the "Facility"), an instrumentality which sought on behalf of insurers and manufacturers to handle asbestos bodily injuries claims. In addition, determinations are required as to the notice of coverage required to be given by the insurer North River to its reinsurer Unigard and the timeliness of such notice and the obligation of the reinsurer for defense costs and the coverage for a stub period of the policy.

These issues are presented against the complicated factual background arising out of the mass tort asbestos litigation, which has to date defied the efforts of the courts to provide a speedy and effective resolution of the hundreds of thousands of claims brought to recover damages by injured plaintiffs and their representatives against hundreds of manufacturers and users of asbestos products throughout the nation. Traditional litigation has been so far unsatisfactory in resolving this mass tort dispute in an efficient, cost-effective and equitable manner.[1] The potentially overwhelming nature of this litigation is well-recognized, and the ultimate resolution of the issues presented here has the potential to affect obligations in the billions of dollars.

*Prior Proceedings*

This action was filed by Unigard on February 3, 1988. Discovery was had, and on July 12, 1990 an opinion was filed denying the summary judgment sought by Unigard (the "July Opinion"). That opinion described the parties and issues, and the findings contained there remain unchanged but are supplemented as set forth below.

Following the July Opinion, additional discovery was conducted, and as if the action were not complicated enough, the parties concluded that North River would assume the role of plaintiff and Unigard the role of defendant for purposes of the presentation of evidence. A bench trial was held from November 8, through November 27, 1990. Final arguments and briefs were submitted on January 18, 1991.

---

1. *See* Kenneally, *Agent Orange & Asbestos: A Case For Federal Common Law,* 5 J. Contemp. Health & Pol'y 201 (1989); Feinberg, *The Toxic Tort Litigation Crisis: Conceptual Problems and Proposed Solutions,* 24 Hous.L.Rev. 155, 159 (1987); Rubin, *Mass Tort & Litigation Disasters,* 20 Ga.L.Rev. 429, 433–38 (1986); McGovern, *Toward A Functional Approach for Managing Complex Litigation,* 53 U.Chi.L.Rev. 440, 491 (1986); Huber, *Safety & the Second Best: Hazards of Public Risk Management in the Courts,* 85 Colum.L.Rev. 277, 319 (1985); Epstein, *The Legal & Insurance Dynamics of Mass Tort Litigation,* 13 J.Legal Stud. 475, 476–77 (1984).

## FINDINGS OF FACT *

### 1. The Parties

Unigard is the successor to Unigard Mutual Insurance Company, Inc. ("Unigard Mutual") and is a Washington corporation with its principal place of business in Seattle. In 1984, it was purchased by the John Hancock Mutual Life Insurance Company.

North River is a New Jersey corporation with its principal place of business there and is a subsidiary of Crum and Forster, Inc. ("Crum & Forster").

Owens–Corning is a Delaware corporation with its principal place of business in Toledo, Ohio.

### 2. The Underlying Insurance Involved

North River through its agent L.W. Biegler, Inc. ("Biegler") issued two excess insurance policies to Owens–Corning in July 1974. Those policies were XS–3619, a second-layer excess policy, and XS–3672, a third-layer excess policy. Unigard reinsured XS–3672. Both policies provided coverage for, among other things, claims for asbestos-related bodily injuries.

XS–3672 provided liability insurance to Owens–Corning during each of the following policy periods: (a) July 9, 1974 to October 22, 1974 ("XS–3672(A)"); (b) October 22, 1974 to October 22, 1975 ("XS–3672(B)"); and (c) October 22, 1975 to October 22, 1976 ("XS–3672(C)"). During the periods XS–3672(A) and XS–3672(B), the policy provided excess liability insurance coverage in the amount of $30 million, as part of a $50 million coverage layer in excess of $75 million in underlying excess insurance and $1 million in underlying primary insurance for Owens–Corning losses. During XS–3672(C), the policy provided $25 million in excess coverage, with similar un-

derlying limits. The coverage for the period XS–3672(C) is not at issue in this action.

For the policy period XS–3672(A), the underlying insurance coverages consisted of: (a) Aetna Casualty & Surety Company ("Aetna") primary insurance in the amount of $1 million; (b) The Home Insurance Company ("The Home") first-layer excess insurance in the amount of $25 million; (c) First State Insurance Company ("First State") second-layer excess insurance in the amount of $15 million; (d) Midland Insurance Company ("Midland") second-layer excess insurance in the amount of $5 million; (e) National Union Fire Insurance Company ("National Union") second-layer excess insurance in the amount of $5 million; and (f) North River second-layer excess insurance policy number XS–3619 in the amount of $25 million.

For the policy period XS–3672(B), the underlying insurance coverages consisted of: (a) Aetna primary insurance in the amount of $1 million; (b) Aetna first-layer excess insurance in the amount of $25 million; (c) First State second-layer excess insurance in the amount of $15 million; (d) Midland second-layer excess insurance in the amount of $5 million; (e) National Union second-layer excess insurance in the amount of $5 million; and (f) North River second-layer excess insurance policy number XS–3619 in the amount of $25 million.

Overall, Crum & Forster wrote approximately $1 billion of liability insurance for Owens–Corning, consisting of $710 million for indemnity and $300 million for defense costs.

### 3. The Reinsurance Certificate Issued by Unigard to North River

Allen Miller and Associates, Inc. ("AMAI") was a managing general agent

---

* The findings of fact contained herein have been modified to preserve the confidentiality of certain information relating to Owens–Corning's participation in the Asbestos Claims Facility. Material which has been redacted from the original opinion has been indicated by " * * * ".

for Unigard Mutual. In July 1974, AMAI issued to North River, on behalf of Unigard Mutual, a pre-printed, standard form certificate of facultative reinsurance,[2] drafted by AMAI, bearing policy number 1–5143, which has given rise to the obligations at issue here. It provided reinsurance coverage to North River in the principal amount of "$5,000,000 each occurrence and in the aggregate part of" the $30 million coverage under XS–3672 for the policy periods XS–3672(A) and XS–3672(B). Originally, the Certificate also provided coverage for XS–3672(C), but this coverage was cancelled by endorsement effective October 22, 1975.

The terms of the coverage under the Certificate were printed on the back of the form. The terms relevant to this dispute provided as follows:

A. [T]he liability of [Unigard] shall follow that of [North River] and, except as otherwise provided in this Certificate, shall be subject in all respects to the terms and conditions of [XS–3672] except as such may purport to create a direct obligation of [Unigard] to the original insured or anyone other than [North River.]

. . . .

C. Prompt notice shall be given by [North River] to [AMAI] on behalf of [Unigard] of any occurrence or accident which appears likely to involve this reinsurance and ... [AMAI], directly or through its representatives and/or counsel, shall ... have the right and be given the opportunity to associate with [North River] and its representatives at [Unigard's] expense in the defense and control of any claim, suit or proceeding which may involve this reinsurance.

D. All claims covered by this reinsurance when settled by [North River] shall be binding on [Unigard,] who shall be bound to pay [its] proportion of such settlements. In addition thereto, [Unigard] shall be bound to pay (1) [its] proportion of expenses ... incurred by [North River] in the investigation and settlement of claims or suits, and (2) [its] proportion of court costs, interest on any judgment or award and litigation expenses ... with respect to reinsurance provided on an excess of loss basis, in the ratio that [Unigard's] loss payment bears to [North River's] gross loss payment. . . .

These provisions are generally referred to in the reinsurance industry and this opinion as the "following form" clause (¶ A), the "notice of loss" and "right to associate" clauses (¶ C), and the "follow the fortunes" clause (¶ D).

Unigard received one-sixth of the premiums paid to North River under both XS–3672(A) and XS–3672(B), less a standard twenty-five percent reinsurance brokerage commission.

4. The Asbestos Injury Crisis

By the early 1980's, lawsuits alleging asbestos-related bodily injuries were pending in state and federal courts in virtually every state in the union. See I. Kakalik, P. Ebener, W. Felstiner & M. Shanley, Costs of Asbestos Litigation, Pub. No. R–3042–ICJ at 13–14 (The Rand Corp., Institute for Civil Justice 1983). By the end of 1982, it was estimated that approximately $1 billion had been spent in connection with these actions, with less than 40% of the funds ever reaching the injured victims.

Producers of asbestos-related products and their insurers engaged in protracted

---

**2.** There are two basic forms of reinsurance: "treaty reinsurance," in which the reinsurer contracts "to indemnify the ceding insurer [i.e., the reinsured,] with respect to an entire 'book' of the ceding insurer's underwriting activities," and "facultative reinsurance," which reinsures only "a specific risk insured by a particular policy or policies." B. Ostrager & T. Newman,

Handbook on Insurance Coverage Disputes § 13.03[a] at 384–85 (2d ed. 1989). A typical treaty reinsurance agreement might reinsure losses incurred on all policies issued by the ceding insurer to a particular insured, while facultative reinsurance would be limited to the insured's losses under a policy or policies specifically identified in the reinsurance agreement.

litigation over the scope and applicability of liability insurance coverage for asbestos-related bodily injury claims. These disputes involved, *inter alia,* the primary insurer's duty to defend claims and whether that obligation continued after the exhaustion of policy limits; the "trigger of coverage" for asbestos-related bodily injury claims, *i.e.,* which policy year or years owed coverage, given the prolonged and continuous nature of asbestos injury and the long latency period for the manifestation of diseases; the ability of insureds to designate from among all "triggered" policies a single insurer in a single coverage period to pay all claims until exhaustion; the application of "other insurance" clauses that govern how policies contribute to losses when the insured has other coverage available; the application of clauses that limit the insured's recovery to a single aggregate limit, irrespective of how many policies are triggered, where all losses arise from a single cause or "occurrence"; and the issues of insurer bad faith and punitive damages. *See generally Commercial Union Ins. Co. v. Pittsburgh Corning Corp.,* 789 F.2d 214 (3d Cir.1986); *Keene Corp. v. Insurance Co. of N. Am.,* 667 F.2d 1034, 1050 n. 3 (D.C.Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) (*"Keene"*); *Owens Illinois, Inc. v. Aetna Cas. & Sur. Co.,* 597 F.Supp. 1515 (D.D.C.1984).

By 1983, nearly 25,000 lawsuits had been filed against asbestos producers and manufacturers. Kakalik *et al., supra.* A group of asbestos producers began exploring ways to avoid the extensive litigation which characterized their efforts to deal with the asbestos problem. Realizing that any alternative system of resolving claims would hinge on an acceptable allocation of losses among themselves, the producers retained the firm of Peterson Consulting Limited Partnership ("Peterson") to help them develop an allocation formula. After exploring several possible methods for allocating liability, such as one based on each producer's market share, the producers agreed to develop a formula which reflected each producer's history of settling and litigating asbestos claims. The percentage allocation formula which was ultimately developed was based upon the average amount that each producer had paid to settle asbestos claims as of a date before the negotiations had commenced.

In 1984, the participants in the Peterson negotiations began to discuss the formation of a joint claims handling center for all asbestos bodily injury claims. This center came to be known as the Asbestos Claims Facility ("the Facility").

### a. Owens–Corning's Situation

Owens–Corning's 1982 10–K report, released in March 1983, reported that there were 15,615 asbestos bodily injury claims pending against Owens–Corning, with an average settlement per claim, based on those claims which had already been closed, of $9,858. Following the release of this report, Biegler decided not to renew North River's excess casualty insurance of Owens–Corning.

In early 1984, Owens–Corning's 1983 10–K report reported 17,468 pending asbestos bodily injury claims against it, with an average settlement for all closed claims as of December 31, 1983 of $9,968.

By early 1985, Owens–Corning's 1984 10–K reported 19,131 asbestos-related bodily injury claims pending against it as of December 31, 1984, with an average settlement for all closed claims, including "no pay" claims, of $10,454 per claim. Owens–Corning's 1985 10–K reported an average settlement of $10,708 per claim as of December 31, 1985.

### b. Crum & Forster's Situation

In 1983, Ian Heap ("Heap"), senior vice-president of Crum & Forster participated in establishing the Crum & Forster Environmental Claims Unit ("ECU") to take responsibility for environmental claims for all of Crum & Forster's insurance affiliates. One of the ECU's primary tasks was to monitor and deal with the growing number of asbestos claims. Robert Clare was assigned to organize the ECU, and James Meyers ("Meyers") was hired as its first manager.

As the Peterson negotiations progressed and the concept of the Facility became more developed, Crum & Forster asked its reinsurance intermediaries to advise its reinsurers that it was giving serious consideration to joining the Facility, and to request that the reinsurers report their reactions to such a move.

In July, 1984, Meyers produced an ECU Status Report on Asbestos–Related Claims (the "Status Report") for his superiors, including Heap, in which he attempted to calculate the exposure Crum & Forster faced on asbestos claims.

The Status Report stated that "total unverified claims reported by C & F insured accounts to one or more of the insured's carriers approximates 257,807. Our records to date indicate 69,631 claims of the 257,807 have been reported to C & F companies." The Status Report listed the Owens–Corning account underwritten by Biegler, which included XS–3672, with an account rating of 2. Status Report Exhibit 1 at 6. That rating was defined as:

Account is being actively followed as there is either the probability of active participation in the near future and/or critical information is required which will either cause us to be involved or absolved. This rating would be applied under, *but not limited to*, the following circumstances:

1. The policy periods are current and there is a question of the exposure date of the claimants.

2. The primary level below is basic and the claimant population is minimal.

3. The claimant population volume is high regardless of the level of the primary cover.

4. The claimant volume and the coverage limits below are such that the probability of our having to participate in the future appears certain.

Status Report Exhibit 4 at 1 (emphasis in original).

The Status Report also summarized the amounts of coverage written by the various Crum & Forster profit centers for various producers at various layers, and contained a detailed reinsurance treaty matrix with the amounts of asbestos coverage retained by Crum & Forster companies net of reinsurance.

In the spring of 1985, a memo produced by the ECU stated:

a. Our 6/18/74 to 9/1/76 excess policies are within the initial coverage block and could possibly become attached, especially at the 2nd excess levels if we deal with the claims within the Facility.

b. Insured is also involved in P.D. and formaldehyde litigation.

c. Per Dan Phillips of Owens Corning, most of the primary coverage has been exhausted although he doesn't have the exact breakdown.

Three of our excess policies effective during the initial block years are over $26 million and stand a good chance of being attached if the claims are handled in the Facility when the payments previously made are reallocated from the post block years. This would result in a charge of about $7 million for each of the 24 years. Thus, our layers could be reached in 2 to 3 years.

Those same policies would be reached in about 3 to 5 years if handled outside of the Facility. This depends upon the [bodily injury] claim volume and the exposure periods alleged and also the impact of the P.D. and formaldehyde litigation and the application of retention on the primary level from 1977 and forward.

d. Whether in or out of the Facility, this account has the potential for our policies to be impacted at some time in the future.

The only two North River policies in effect during the time period referred to were XS–3619, which was second-layer excess of $26 million, and XS–3672, third-lay-

er excess of $76 million, thus the observation concerning "three of our excess policies" which are "over $26 million" appears to refer to the three separate policy periods of XS–3619.

In August 1985, Arthur P. Kirkner ("Kirkner") became assistant vice-president of the ECU, and in September 1986 became vice-president and manager of the ECU. Kirkner was responsible for handling claims paid by the Facility on behalf of Owens–Corning, for monitoring certain files within the ECU and for supervising all claims handling staff.

### 5. The Wellington Agreement

The discussions among insurers and manufacturers culminated on June 19, 1985 with the execution of the Agreement Concerning Asbestos–Related Claims (the "Wellington Agreement" or the "Agreement"), to which Crum & Forster and its subsidiaries, including North River, became signatories. In addition to Crum & Forster, forty-nine other companies executed the Wellington Agreement.

The producers of asbestos-containing products that executed the Agreement (the "Subscribing Producers") included the following:

Armstrong World Industries, Inc.

The Celotex Corporation

Eagle–Picher Industries, Inc.

Fibreboard Corporation

National Gypsum Company

Owens–Corning

Pittsburgh Corning Corporation

United States Gypsum Company

In addition, many of the largest insurance companies executed the Agreement (the "Subscribing Insurers"), including the following:

Aetna

Cigna Property & Casualty Insurance Companies

The Continental Insurance Company

Employers Insurance of Wausau

Fireman's Fund Insurance Company

First State

Hartford Insurance Group

Liberty Mutual Insurance Company

Lloyd's of London and Certain London Companies

Royal Insurance Company

However, several major insurers never joined the Facility, including The Travelers, AIG Companies, Commercial Union, The Home, The Highlands, CNA, General Accident, and Allstate.

Heap, Crum & Forster's senior representative in the Wellington negotiations, wrote a memorandum dated June 21, 1985, stating:

> It was not expected that there would be unanimity by reinsurers in acceptance of the Agreement, nor was it expected that any reinsurers would be willing to sign a blank check for recoveries on asbestos-related claims, but it was necessary that insurers attain an acceptance by reinsurers of the basic principles of the Agreement and agree that payments made by the Facility would be seen to be good payments for the purpose of reinsurance recoveries. It was always understood that reinsurance recoveries for [F]acility claim payments would be subject to the terms and conditions of the treaty or certificate language, and it is understood that with or without the Facility there will inevitably be differences of opinion between insurers and reinsurers on such matters as the definition of "occurrence" and other coverage issues.

The Wellington Agreement resolved many of the disputes between and among the Subscribing Producers and the Subscribing Insurers and expressly preserved certain additional disputes to be resolved by arbitration, thereby removing them from the jurisdiction of the courts. These disputes included the following:

a) the existence of a defense obligation;

b) the effect of missing or cancelled policies;

c) misrepresentations in the underwriting process;

d) failure to pay premiums;

e) the application of asbestos and asbestosis exclusions;

f) the application of punitive damages exclusions.

### a. The Facility

The Wellington Agreement created the Facility as a non-profit organization to "administer and arrange for the evaluation, settlement, payment or defense" of asbestos-related bodily injury claims asserted against Subscribing Producers and Subscribing Insurers in accordance with the terms of the Agreement and the "professional standards applicable to Subscribing Insurers," and achieved an extensive and mutual release of all claims between and among the Subscribing Producers and the Subscribing Insurers which resulted in the withdrawal and dismissal of those claims from pending coverage actions "with prejudice and without delay."

The Facility was a joint enterprise created and run by parties with adverse interests, controlled by a Board of Directors consisting of an equal number of representatives from the Subscribing Producer members and the Subscribing Insurer members and was responsible for the administration, evaluation, settlement, payment and defense of all asbestos-related claims asserted against any of the Subscribing Producers. It fulfilled this responsibility by retaining common counsel to defend the interests of all producers, requiring "credible medical evidence" on each claim prior to settlement, and making payments to compensate only for "asbestos-related physical impairment and dysfunction" but not for punitive damages.

### b. The Indemnity and Expense Percentage Allocation Formulas

The producers were informed of their initial producer allocation shares at the signing of the Agreement. As had been previously agreed, these shares were based on the relative amount each producer had paid on asbestos claims, both settlements and judgments, prior to the start of the Peterson negotiations. As for the Facility's operating expenses, each Subscribing Producer's percentage of those was calculated based on the total number of open claims against the producer as of September 30, 1983.

Since the asbestos-containing products produced or distributed by the Subscribing Producers were used for a wide variety of purposes, in different ways and in different industries, the contribution percentages of each producer were anticipated to vary over time according to the changing demographics of the claimant population. The producer allocation percentages were therefore subject to periodic adjustment after the Facility began operating, with an agreed upon cap of fifteen percent per adjustment.

### c. Confidentiality of the Facility's Data

The Subscribing Producers were extremely concerned about the confidentiality of information concerning their respective liability shares and the erosion of their insurance asset bases. They did not want this information made available to other producers (against whom they might have asserted cross-claims and might reassert cross-claims if there were withdrawals from the Facility), to insurers for other producers, to the plaintiffs' bar, or to anyone else. Therefore, the Wellington Agreement required the Facility, to the extent practicable, to preserve the confidentiality of all information relating to the producer allocation shares.

The Facility's Board of Directors recognized that at least some of this information could be derived from information concerning which of the Subscribing Insurers was making payments to the Facility on behalf of which producers and under which policies. Accordingly, all such information was deemed proprietary and confidential by the Board of Directors.

Therefore, from the inception of the Facility until at least 1987, all information concerning payments made to the Facility and all information relating to the erosion of a Subscribing Producer's underlying insurance asset base was revealed to a Subscribing Insurer only if that insurer's policy had been penetrated, *i.e.*, only when that insurer was being required to pay.

As consideration for each settlement payment, the Facility obtained releases running to every producer signatory, whether or not it was named as a defendant, and whether or not its product was shown to be the cause of injury, in order to end cross-claims among the producer signatories.

Owens–Corning was named as a defendant in * * *% of the claims considered by the Facility.

### d. The Trigger of Insurance Coverage Under the Facility

The Wellington Agreement also set forth the method by which each Subscribing Producer's asbestos losses would be allocated among the various insurers and various policies which the producer held. The identification of the policy years, coverage layers and periods of self-insurance which were responsible for paying claims was based on the so-called "triple trigger rule" set forth in *Keene, supra,* 667 F.2d at 1042–47.[3]

Rather than exercise the power—which had previously been granted to producers by a number of courts—to designate a single insurer or a single year of coverage to respond to all claims until the exhaustion of all limits at all layers, each Subscribing Producer designated a span of coverage periods commencing no earlier than the date of its initial manufacture of an asbestos-containing product and ending at some date between January 1, 1973 and December 31, 1979, as its "initial coverage block." The policies within that block then responded to claims, layer by layer, until exhaustion. For any given claim, a policy within the initial coverage block was "triggered" only if: (1) it had been reached by the erosion of underlying limits in its coverage period, and (2) the claimant had suffered injury during the policy period. Following the triple trigger rule, the period of injury

was defined as the period of time from the claimant's first exposure to asbestos through the date of diagnosis or death, whichever was earlier. Each triggered policy paid a share of the Subscribing Producer's portion of the claim based upon the number of days of injury falling within its policy period. Expenses were allocated in the same proportion as indemnity payments among those policies in the initial coverage block that both provided coverage for expenses and had been reached.

Because of the initial coverage block system, the Agreement prevented the producers from concentrating all claims on a single year of coverage and demanding payment from all insurers for that year before tapping coverage in any other year, a practice that was otherwise permissible under the triple trigger rule.[4] *See Keene,* 667 F.2d at 1050.

The "trigger of coverage" mechanism and initial coverage block system implemented under the Wellington Agreement were reasonable, good faith compromises between and among the Subscribing Producers and Subscribing Insurers.

### 6. The Termination of the Asbestos Claims Facility

Exercising its right of election under the Wellington Agreement, Owens–Corning terminated the Facility's authority to handle claims asserted against it after October 3, 1987 and assumed responsibility for handling such claims itself. The Facility was dissolved by vote of its members as of October 1988. After the dissolution of the Facility, Owens–Corning re-assumed control over claims that had been asserted against it prior to October 1987 as well. The Facility continues to operate for the purpose of winding up its affairs.

**3.** In *Keene,* the D.C. Circuit held that insurance coverage was triggered if the policy was in effect at any of the following times:
(1) when the victim was exposed to asbestos;
(2) when the victim developed the disease, which might be prior to the time at which it could be diagnosed; or

(3) when the disease manifested itself, *i.e.,* when it could be diagnosed.
667 F.2d at 1044–45.

**4.** Of course, an insurer which was so designated would have been entitled to seek contribution from other insurers whose policies had been

No evidence was presented to establish that any of the asbestos bodily injury claims paid by North River under XS–3672 —the claims at issue in this litigation— were settled by Owens–Corning earlier than September 1988, nearly a year after its withdrawal from the Facility. The payment on the claims at issue were paid by Owens–Corning alone, without reference to the Facility's producer allocation formula.

### 7. Reinsurance Claims Handling at Unigard

AMAI went out of business in 1976. Thereafter, responsibility at Unigard for its book of business, which included the Certificate, fell to Jerry Killen ("Killen") who handled it until 1980. Killen continued to underwrite reinsurance for Unigard until he retired in May, 1984.

Unigard's Facultative and Special Risk Department ("FSRD"), located in Seattle, was the next office to take control of the AMAI book. The FSRD was run by Richard Maydahl ("Maydahl") from 1982 until his retirement on May 31, 1986. During that time, the FSRD consisted of Maydahl and his secretary. When Maydahl retired in 1986, the files for the AMAI business were transferred to the Boston offices of Hanseco, another Hancock affiliate.

The Unigard Reinsurance Assumed treaty department ("Unigard RA") was responsible for reinsurance underwriting and claims arising out of Unigard's participation on reinsurance treaties. Byron Todd ("Todd"), was Claims Manager of Unigard RA from mid–1981 until his retirement in February 1985. In August 1984, Todd wrote a memo indicating that on over 2,000 treaties, Unigard RA's total incurred asbestos related bodily injury reserves amounted to $3,000,000.

As of June 1984, both Maydahl and Todd reported to Charles Palmerton ("Palmerton"), Vice President and General Claims Manager of Unigard, who in turn reported to Richard Brown ("Brown"), the President of Unigard from 1983 until he left the

company in 1986. Palmerton and Brown were responsible for both facultative and treaty reinsurance.

Although Maydahl and Todd both worked for the same person, Maydahl never handled claims for Unigard RA, nor did the FSRD and Unigard RA share personnel, office space, files, or computer data bases.

Beginning in May 1986, William Hutt ("Hutt"), a Hanseco claims handler, had responsibility for handling the AMAI book of facultative insurance business on behalf of Unigard. Hutt's supervisor was Gerald Guilbert ("Guilbert").

### 8. Communications With Respect to the Facility

On July 18, 1984, Crum & Forster sent a telex addressed to Killen at Unigard ("the Killen Telex"), indicating that Crum & Forster was giving serious consideration to entering the Wellington Agreement and seeking Unigard's advice. However, the telex contained no reference to either North River or the Certificate.

It was commonly known in the insurance industry that insurance companies were required to join the Wellington Agreement on an all-or-nothing basis with respect to their insurance contracts with all signatory insureds. The Killen Telex specifically referred to general casualty, comprehensive catastrophe and casualty contingency reinsurance treaties.

Best's, a standard reference work used in the insurance industry, contains information on the relationship between Crum & Forster and North River.

Killen had retired in May 1984, two months before the Killen Telex was sent. The Killen Telex was received by Shanley Van Ditto ("Van Ditto"), an underwriting support manager at Unigard, who never responded.

triggered, under the theory of equitable subrogation, so that a producer's election to concentrate on a single year would not leave one with

the entire burden of paying all of the producer's claims.

In an inter-office memorandum to Palmerton dated August 15, 1984, Todd wrote:

> We have been contacted by two reinsureds concerning membership in the [F]acility.... It is my present thought that as reinsurers we should look at each reinsured separately to determine our position. If we do not make any recommendations we can take exception to individual claims as they are presented if they violate the reinsurance contract because of membership in the facility.
>
> My personal opinion is that large savings of costs should be accomplished by having this facility and Unigard should agree to participation unless by doing so we will have to pay a larger amount than we would without it.

On August 6, 1984, the Industrial Indemnity Company ("Industrial"), a subsidiary of Crum & Forster, sent a letter to Unigard through its reinsurance intermediary Guy Carpenter & Company, Inc., advising Unigard that Crum & Forster was giving serious consideration to the execution of the Agreement and soliciting Unigard's reaction. Unigard's response, dated November 7, 1984, stated:

> It is recognized that the industry faces very large potential exposures from asbestosis and that alternative methods of handling those exposures warrant consideration.
>
> After reviewing all of the material available to us, the Asbestos Claims Facility appears to have merit as a mechanism for treating asbestos claims. We have no objection to Industrial's joining the facility.

On October 9, 1984, Matthew M. Murphy ("Murphy"), vice president of Biegler, wrote a letter to Todd concerning Biegler's possible entry into the Agreement. The letter stated

> Your firm assumed various participations in the captioned reinsurance agreement throughout the mid–1970's. As you know, we have received claims against holders of policies reinsured by the captioned agreement.
>
> ....
>
> Will you ... favor us with your remarks regarding your acquiescence to our participation in the Asbestos Claims Facility.

However, despite Murphy's two references to "the captioned agreement," the only caption appearing on the letter was "ASBESTOS CLAIMS FACILITY." There was no identification of the Certificate or any other reinsurance agreement between Biegler and Unigard.

On October 19, 1984, Brown wrote on behalf of Unigard to John F. Shea, the chairman of the Asbestos Claims Council:

> After reviewing all of the material available to us, we have elected not to participate in the Asbestos Claims Facility. This is not to say that it does not have merit as a mechanism for treating asbestos claims, merely that it does not fit our writings and exposures.

On January 15, 1985, Todd endorsed Continental Insurance Company's possible signing of the Agreement, stating:

> While Unigard itself has decided not to join the [Asbestos Claims] Council we believe that for companies having substantial exposure that the Council is a good thing....

On that same day, Todd also endorsed Royal Insurance Company's entry into the Agreement:

> [Unigard] favor[s] participating in the Wellington Agreement and certainly would have no quarrel with paying for the expenses that relate to the [Facility's] claim settlement activities.

Finally, on January 15 Todd also responded to Murphy's October 9 letter. He did not mention Murphy's failure to identify a specific reinsurance agreement in his original inquiry. Todd explained Unigard's position on Biegler's participation in the Facility:

I first want to advise you that Unigard's management has decided not to join the [F]acility but I hasten to state that Unigard is not a large writer of coverages in which asbestos is involved. We had a short lived excess and surplus lines operation which does have a little exposure on both the facultative reinsurance basis and the excess basis but otherwise we do not have sufficient claims to merit joining.

My own personal belief is that [the Facility] would be a good one for a company in your position which did write considerable cover [*sic*] for the various asbestosis involved companies. I believe that from a standpoint of concentrating expertise, efficient claims handling through one source and presenting a favorable image to the general public for the insurance industry this is a plus and certainly as a participant in your various treaties we would welcome claim handling by [the Facility].

At no time prior to the signing of the Wellington Agreement did North River or Crum & Forster or any agency on its behalf address Unigard with specific reference to either the Certificate or XS–3672.

*9. Insurance Industry Custom and Practice*

a. Setting of Reserves

i. In general

An insurance reserve is an allocation of financial resources for claims likely to be paid in the future. When a reserve is set, a liability is incurred which is reflected in the company's financial statements. Insurance companies are required to set reserves by both insurance regulations and accounting procedures.

There are two types of reserves: (a) case reserves and (b) reserves for losses incurred but not reported ("IBNR"). Case reserves are reserves for claims likely to be paid under a specific policy. IBNR reserves are reserves for losses that are anticipated but have not yet been reported under any policy; these reserves are not tied to specific policies and are calculated from actuarial statistics.

There is no uniform practice used to set case reserves. An insurer that waits to set reserves until all of the uncertainties relating to a claim are eliminated is not actually reserving at all, but rather merely paying claims. Therefore, when setting reserves an insurer must make some assumptions about a variety of factors that could affect the ultimate payment of a claim. If, while handling a claim, an insurer acquires new information that renders one of its initial assumptions incorrect, the insurer will adjust its reserves for future claims as appropriate.

Projections on potential exposures relating to asbestos have been difficult to make because historical settlement values do not support long-range predictions of liabilities. The claimants are not a homogeneous group, the claims arise in different industries, from construction to shipyard work to manufacturing, and the claims involve different magnitudes of exposure and implicate different products and producers. Furthermore, the mushrooming asbestos crisis has led to fundamental changes in the customs and practices of the insurance industry itself as insurers have come to understand more fully the extent of their potential liabilities.

Moreover, insurers may sometimes be reluctant to establish reserves, particularly reserves in the many millions of dollars, for financial reasons, even when they believe that a policy will be reached. In fact, an insurer may try to put off setting reserves of that magnitude for as long as possible. For example, a company may prefer to postpone setting reserves from October or November until the beginning of the following year, so that the additional liability does not show up on year-end financial statements. As another example, if an insurer has ceded all of its risk to reinsurers, the cedent will have little need to set large reserves, because it bears no risk of loss. Thus the reserving practices of insurance companies may involve factors beyond the evaluation of the specific claim or policy in question.

ii. Excess insurers and reinsurers

Excess insurers and reinsurers generally set reserves by relying upon information

obtained from the insured and from underlying insurers concerning the possible invasion of underlying limits. They base the setting of case reserves upon information concerning (a) payments made against the underlying insurance limits and (b) reserves set by the underlying insurers. However, because an insurer may base the posting of reserves on non-risk related considerations, reinsurers cannot always rely on the ceding company's setting of reserves to inform their own decisions.

b. Notice

i. To direct insurers

Notice clauses in direct insurance contracts are designed to enable the insurer, upon receipt of notice of a claim, to investigate the claim while the evidence is fresh, thereby protecting against fraud, and to fulfill its duty to defend the insured and to make early settlements where appropriate.

ii. To reinsurers

Notice clauses in reinsurance agreements are designed to: (a) apprise the reinsurer of potential liabilities, to enable it to set reserves; (b) enable the reinsurer to associate in the defense and control of specific underlying claims being paid under the policy reinsured; and (c) assist the reinsurer in determining whether and at what price to renew reinsurance coverage. Reinsurers generally want notice as soon as the cedent believes that the reinsured policy may be reached.

Under industry custom and practice one element in the timeliness of notice under a reinsurance agreement is the posting of a reserve by the ceding company. A notice provision such as that contained in the Certificate generally is interpreted to require a cedent to give notice to reinsurers within a reasonable time after the cedent has set case reserves for the reinsured policy, because the process of setting case reserves itself reflects a determination by the cedent that the policy will at some point be reached, and thus that the reinsurance will be involved. Depending on the circumstances, such notices are usually sent within a period ranging from several weeks to six months after the ceding company determines that its obligation to give notice has been triggered.

Some reinsurance agreements provide more specific requirements for the time at which notice shall be given.

Starting in 1988, the industry custom changed as ceding companies generally started to provide reinsurers at all layers with notice of all reported environmental claims, rather than waiting until underlying layers had been eroded to the point that the reinsured policies were expected to be reached.

c. Reinsurer involvement in claims

A "right to associate" clause gives a reinsurer the right to participate at its own expense in the defense and control of underlying claims and suits or proceedings brought against the insured that might be paid under the policy reinsured. Only rarely do reinsurers actually participate in the defense and control of underlying claims, suits or proceedings which may involve their reinsurance.

Unigard has never participated at its own expense in the defense and control of any underlying claims, suits or proceedings which may involve its reinsurance. During the period from 1982 through May 1986, when the Unigard FSRD was responsible for the AMAI book of business, Unigard did not even have the personnel or the facilities to participate in the handling of underlying asbestos claims.

A ceding company has a contractual duty to its insured to make good faith coverage determinations concerning claims submitted by the insured. Breach of that duty exposes the ceding company to extra-contractual liability, including liability for unfair claims-handling practices and punitive damages. Reinsurers do not generally have a contractual relationship with the underlying insured.

It is the understanding in the industry concerning facultative agreements such as the Certificate that if the cedent's underlying policy owes defense costs in excess of the indemnity limits, then the reinsurer pays defense expenses in addition to "reinsurance accepted" limits.

### 10. North River's Involvement with the Facility

a. North River's Analysis of Its Exposure

In February 1986, North River changed Owens–Corning's account rating from 2 to 1. This rating had been defined as:

Account requires active handling.

This rating would be applied under, but not limited to, the following circumstances:

1. On all newly reported losses until such time as the investigation/facts warrant a change.

2. All accounts which involve the handling of a Declaratory Judgment action.

3. All accounts which involve a primary policy, we are either the direct handler or following another carrier who has assumed the lead and we have or will make payments for indemnification and/or expense.

4. All accounts which involve an excess and/or umbrella policy and we are either presently an active participant or are about to become one in the very near future.

Status Report Exhibit 4 at 1.

Between May 1986 and March 1987, North River sought information from the Facility concerning the erosion of Owens–Corning's underlying insurance limits and the potential exposures, if any, for XS–3619 and XS–3672. In accordance with its confidentiality policy, the Facility refused to release any information to North River concerning payments made on behalf of Owens–Corning until North River's policies were reached.

The Facility reported in its billing summary for Owens–Corning through May 1,

1986 that there was approximately $* * * in remaining available signatory coverage and $* * * in remaining available signatory and non-signatory coverage to Owens–Corning in the initial coverage block.

b. The Aetna Exhaustion

On February 18, 1987, Aetna sent a letter to the Facility's finance department reporting that, as the result of an eighteen-month long audit of its total payments on behalf of Owens–Corning, it had recently discovered $24,527,403.47 of unreported pre-Facility consumption, i.e., amounts paid on Owens–Corning claims prior to the establishment of the Facility. This additional consumption meant that Aetna had exhausted the limits of its first-layer excess policy—the policy underlying XS–3619—for the period XS–3672(B).[5]

The Aetna letter was received by the Facility on March 13, 1987. The Facility immediately informed North River by telephone that all pending claims would be tendered to the excess policies on the next layer, including XS–3619. Prior to that time, neither Aetna nor the Facility had informed North River that the policies underlying XS–3619 were in any danger of being exhausted. North River received a copy of Aetna's letter verifying the exhaustion of the Aetna policy on March 27, 1987.

c. North River's Response to the Aetna Exhaustion

As a result of the penetration of XS–3619, on April 1, 1987 North River posted case reserves in the amount of $105 million, representing the full $75 million limit of XS–3619 ($25 million aggregate in each of the three policy periods) and the $30 million limit of another North River policy on that layer.[6]

Also on that day, Kirkner sent a memorandum to Crum & Forster Managers Corporation in New York ("CFMCNY"), regarding the Owens–Corning account, stating:

---

5. In fact, Aetna stated that it had paid out $300,948 in excess of the policy limits.

6. Policy XS–4073, a $30 million excess insurance policy for the period October 22, 1976 to October 22, 1977.

I enclose a proposed first-notice type report that, if you deem adequate, can be forwarded to the participating reinsurers on XS–3619, XS–4073, and XS–3672 for each year these contracts were in place.

The enclosed notice was a three-page document which provided all of the information obtained by Crum & Forster from the Facility in March 1987. CFMCNY had underwritten both XS–3619 and XS–3672, and was therefore responsible for transmitting notices of loss to the reinsurers. The ECU was responsible for advising CFMCNY when to send such notices. In mid-April, North River sent notices of loss to the reinsurers on XS–3619. At that time, at least $100 million in insurance coverage remained available for payment of claims against Owens–Corning before penetration of the XS–3672 layer.

North River then began monitoring the erosion of XS–3619, in order to evaluate the risk to XS–3672 and to determine whether case reserves should be posted and notice given to reinsurers of that policy. Based on information which it received from the Facility relating to the total number of claims, the average settlement value per claim, and Owens–Corning's producer allocation percentage, the ECU estimated Owens–Corning's ultimate exposure at $583,000,000. According to the Facility billing memorandum for Owens–Corning on December 31, 1986, there were signatory and non-signatory limits of $* * * in remaining available coverage in the initial coverage block, with $* * * remaining below XS–3672. Owens–Corning's estimated ultimate exposure was thus more than all of the remaining coverage it had available, and North River accordingly projected complete exhaustion of its $105 million reserves for XS–3619 and XS–4073.

Crum & Forster also produced a document titled "Asbestos Claim Facility–Exposure Analysis Overview" for Owens–Corning. This document, apparently computer-generated, was dated April 29, 1987. It was not authenticated, nor did any witness appear who had knowledge of its preparation or use. The document contained much of the same information contained in Crum & Forster's Multi–Line

Large Claim report prepared for policy XS–3619 on April 1, 1987. The document stated:

> Insured's share of Facility exposure equals $583,640,640 (* * *% of $* * *). North River policies XS–3619, XS–4073, XS–3672 collective $195,000,000 limits will be consumed. XS–3672 will need to be reserved at $90,000,000 collectively ($30,000,000/at 3 years). Initial coverage block net [sic] sufficient to cover exposure. Second coverage block policies will face $283,000,000 in remaining claims.

In April 1987, Kirkner retired from the ECU, and Robert DeMaria ("DeMaria") was appointed to replace him temporarily until a permanent replacement could be found. DeMaria had previously been staff claims counsel at Crum & Forster for three years and had no claims handling experience.

In June 1987, Unigard conducted a week-long audit of Crum & Forster's ECU for the purpose of reviewing its claims-handling procedures. The audit was conducted by Jane Savard ("Savard") who was at that time the Reinsurance Claims Supervisor for Environmental Claims at Unigard. During her review, Savard reviewed many files, including the Owens–Corning file, and met with various ECU staff members. At the end of her audit Savard concluded that the ECU staff was qualified. In a handwritten note to DeMaria, Savard stated that the ECU was "on its way to becoming very effective."

### 11. North River's Notice on the Certificate

On June 30, 1987, North River decided to send precautionary notices to the reinsurers of XS–3672 even though no reserves had yet been posted for the policy. This was based on a newly instituted ECU policy under which notices of loss on environmental risks would be sent irrespective of the status of case reserves on a specific reinsured policy.

CFMCNY thereafter prepared to transmit the notices. On July 16, 1987, Steve Falk, Manager of Reinsurance Accounting for Crum & Forster at CFMCNY, sent a memo to George Luteran ("Luteran"), who was handling the Owens–Corning account at the ECU, stating that because of "the magnitude and exposure" of the Owens–Corning loss, coordination was essential between the ECU and the CFMCNY reinsurance accounting department.

On July 21, 1987, Robert Miller, a senior vice president of Crum & Forster Commercial Insurance, wrote a memo recommending the establishment of a reinsurance control unit. Miller wrote that

> [T]he responsibility for reporting claims matters to reinsurers is not really coordinated or controlled, but rather left up to the individual claim units. Even though numerous memorandums and procedures have been written with regard to reinsurance reporting there are no real controls in place to ensure that reporting, in fact, is occurring and that the quality of that reporting meets the minimum criteria of the reinsurers.

Following Miller's recommendation, John Russotti ("Russotti") was hired by Crum & Forster in September 1987 to establish a Crum & Forster reinsurance claim unit. Russotti was unaware of any reinsurance reporting procedures in existence before September 1987.

On August 18, 1987, CFMCNY sent a notice of loss to Unigard in connection with the Certificate. The form of notice was virtually identical to the report that Kirkner had prepared for reinsurers in April 1987, with only the date and the author's name changed.

North River's notice was not received by Unigard until on or about September 2, 1987, nearly six months after the date of Aetna's notice of exhaustion. At that time, North River had not yet posted case reserves for XS–3672, except for the nominal case reserve of $100 necessary to create a file on the computer system, and no claim had been made under XS–3672.

## 12. North River's Reserves on XS–3672

Shortly after the notice was sent to Unigard, Roger Prickett ("Prickett") became a vice-president and manager of the Crum & Forster ECU. In October 1987, in response to a request from Luteran, the Facility projected that XS–3672 would be reached in January 1989. Based on this projection, Luteran recommended to Prickett that the full $85 million aggregate limits of XS–3672 be reserved. Prickett, however, discounted the Facility's projection and the ECU's analysis of Crum & Forster's exposure, and declined to post the reserves at that time.

By late January 1988, Prickett concluded that reserves should be set on XS–3672. Because of the size of the account he thought that he should inform his supervisors of his decision, but at trial he was unable to recall any specific discussions with them on the subject. Prickett did not put into writing the basis for his decision to reserve the full aggregate limits of the policy, or the factors which he considered with respect to the timing of the reserve declaration. At trial, he testified that these factors would have included the possible effect of government intervention in the asbestos litigation crisis; the bankruptcy of Johns–Manville, a major asbestos producer; and the possibility of tobacco company liability and its potential impact on insurers. Case reserves for XS–3672 were authorized by senior management in March 1988.

From all the available facts it must be inferred that some of the delay in setting this reserve was due more to corporate considerations rather than traditional insurance determinations. However, given the policy limits of XS–3672, and the size of the case reserves under consideration, the delay between Prickett's recommendation and the approval of senior management at Crum & Forster was consistent with industry custom and practice.

### 13. Unigard's Response to the Notice on the Certificate

On October 7, 1987, in response to North River's notice under the Certificate, Hutt, on behalf of Unigard, conducted an audit of Crum & Forster's ECU. As a result of this audit, Hutt concluded that North River did not know prior to Aetna's notice in March 1987 that the insurance coverage layers underlying XS-3672 were likely to be invaded. Nevertheless, Hutt recommended to Guilbert that Unigard deny any claim by North River under the Certificate on the basis of late notice, and Guilbert accepted that recommendation.

On January 21, 1988, Unigard sent North River a letter disclaiming reinsurance coverage under the Certificate for any losses incurred under XS-3672 and on February 3, 1988 Unigard commenced this action.

### 14. Claims Paid Under XS-3672

North River received its first bill from Owens-Corning under XS-3672 in March 1989. That bill sought payment of indemnity under XS-3672(B) for asbestos bodily injury claims in the amount of $3,563,-779.83. North River made its first reinsurance claim under the Certificate in June 1989, seeking $593,939.55 in indemnity payments.

North River made its second reinsurance claim under the Certificate in November 1989. That bill sought $3,742,788.47, consisting of the unpaid balance from the June bill plus an additional $2,203,911.88 in indemnity payments and $944,937.04 in expenses, all for claims under XS-3672(B). The bill indicated that expenses were considered supplemental to the aggregate policy limits under both XS-3672 and the Certificate.

In July 1990, North River made its third reinsurance claim under the Certificate. By this time, North River's aggregate limit of $30 million indemnity for XS-3672(B) had been exhausted, and North River accordingly sought the full $5 million aggregate indemnity under the Certificate, together with $5,298,317.94, representing one sixth of North River's defense expenses under XS-3672(B) to that time. Although the indemnity limit had been reached, North River indicated that further expense payments might be called for under the policy and the Certificate.

The proofs of loss sent by North River to Unigard pursuant to XS-3672 and the Certificate were of a type commonly used in the industry to request payment.

None of the asbestos bodily injury claims covered under XS-3672 was settled as a result of the Wellington Agreement or settled by the Facility. None of the asbestos bodily injury claims billed by Owens-Corning under XS-3672 was settled earlier than September 2, 1988, exactly one year after Unigard received notice on the Certificate. Unigard has presented no evidence that any of these claims was not covered under the terms of XS-3672. North River's payments pursuant to XS-3672 were made in good faith.

Unigard did not seek to participate with North River or Owens-Corning in the defense of any underlying asbestos claims against Owens-Corning and has never given any consideration to doing so.

Unigard no longer writes reinsurance business. It has not issued any facultative reinsurance certificates since 1974 and has not issued any treaty reinsurance contracts since 1984.

None of the claims submitted to Unigard by North River under the Certificate have been paid. The only case reserves which have been posted by Unigard under the Certificate are for expenses associated with the litigation of this action.

### 15. The Costs of Defense

Under the "following form" clause, the Certificate is made subject "in all respects to the terms and conditions of" XS-3672. In an arbitration in July 1989, the Honorable H. David Hermansdorfer held that under XS-3672 North River was required to pay expenses in excess of the $30 million indemnity limit for each policy period.

Unigard has paid defense expenses in addition to the "reinsurance accepted" limit

in connection with reinsurance claims submitted by some of its other cedents.

### 16. The Stub Period XS–3672(A)

No claims have yet been made on North River for indemnity or expenses under XS–3672(A). As does the XS–3672(B) policy, the XS–3672(A) policy has a $30 million limit per "occurrence" and in the aggregate. Thus the full $30 million of the policy is payable if a single occurrence (such as an explosion or collision) results in a $30 million loss during the policy period. As explained above, the Certificate reinsured one-sixth of the $30 million aggregate and per-occurrence limits of XS–3672(A), or $5 million.

### 17. The North Shore Audit

In November 1989, Unigard retained North Shore International Insurance Services, Inc. ("North Shore") to audit Owens–Corning's handling of certain asbestos bodily injury claims paid under XS–3672.

Following the completion of that audit, North Shore did not prepare a written audit report, and Unigard stated that it would "not proffer any evidence at trial relating in any way to the November [1989] audit," and would not assert any "grounds for non-payment based in whole or in part on information obtained" in the November 1989 audit.

## CONCLUSIONS OF LAW

### 1. Jurisdiction

The court has jurisdiction over the parties and the action pursuant to 28 U.S.C. § 1332.

### 2. Unigard Must Follow the Fortunes of North River on XS–3672

The Certificate binds Unigard to "follow the fortunes" of North River on the Owens–Corning risk by providing that "[a]ll claims covered by this reinsurance when settled by [North River] shall be binding on the Reinsurers, who shall be bound to pay their proportion of such settlements."

Unigard is therefore bound to reimburse North River for payments made on Owens–Corning's behalf so long as the payments are reasonably encompassed within the bounds of the policy. *See American Ins. Co. v. North Am. Co. for Prop. & Cas. Ins.*, 697 F.2d 79, 81 (2d Cir.1982) ("*NACPAC*") (cited with approval in *Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910, 912 (2d Cir.1990)) ("*Bellefonte*"); *Insurance Co. of N. Am. v. United States Fire Ins. Co.*, 67 Misc.2d 7, 10–11, 322 N.Y.S.2d 520, 523–24 (Sup.Ct. 1971), *aff'd*, 42 A.D.2d 1056, 348 N.Y.S.2d 122 (1st Dep't 1973). An insurer may possess and waive arguable defenses to coverage without altering the duty of a reinsurer to indemnify the ceding insurer for the coverage payment. *General Ins. Co. of Trieste v. Nutmeg Ins. Co.*, No. 6213–85, slip op. at 7 (Sup.Ct.N.Y.Co. July 24, 1987) ("*Generali*"). This principle has been long recognized:

> [I]n the absence, therefore, of fraud or bad faith on the party of the [cedent], the [reinsurer], by the terms of its policy ... is in no position to object to the mode of adjustment made by the [cedent].

*Insurance Co. of N.Y. v. Associated Mfrs. Mut. Fire Ins. Co.*, 70 A.D. 69, 70–71, 74 N.Y.S. 1038, 1039 (1st Dep't 1902), *aff'd*, 174 N.Y. 541, 66 N.E. 1110 (1903). *See also Hastie v. DePeyster*, 3 Cai.R. 190, 194 (N.Y.Sup.Ct.1805) (reassurance contract "obliges the re-assured to act with good faith, but leaves him in all other respects to his own discretion and prudence in admitting or contesting the claim of the first insured."); *New York State Marine Ins. Co. v. Protection Ins. Co.*, 18 F.Cas. 160 (C.C.Mass.1841) (No. 10,216) (under "follow the fortunes" it is within discretion of party reassured to contest or to admit the claim of first assured) (Story, J.).

The Second Circuit has stated that where "there is genuine ambiguity over what a settlement covers, a 'follow the fortunes' clause may obligate a reinsurer to contribute to a settlement even though it might encompass excluded items." *NACPAC*,

697 F.2d at 80. However, in *NACPAC* the reinsurer was excused from liability because the settlement payments had been clearly outside the scope of the policy reinsured.

The Second Circuit has subsequently reaffirmed the validity of the "follow the fortunes" doctrine in *Bellefonte*, 903 F.2d at 912, stating that it "burdens the reinsurer with those risks which the direct insurer bears under the direct insurer's policy covering the original insured."

The authorities cited above define the scope of a reinsurer's obligation. While a "follow the fortunes" clause does not obligate the reinsurer to pay for settlements which encompass losses outside the scope of the insurance coverage, the reinsurer may not second guess the cedent's good faith decision to pay any claim that is arguably subject to coverage.

As discussed in the findings of fact, North River's participation in the Wellington Agreement, its payments under XS–3619 through the Facility, and its payments on both XS–3619 and XS–3672 following Owens–Corning's withdrawal from the Facility were good faith resolutions of issues reasonably within the scope of the policies. Further, the facts establish that none of the insurance or reinsurance claims at issue in this action were paid under the Wellington Agreement or pursuant to its producer allocation scheme. Unigard has not been deprived of its right to participate in the resolution of the asbestos claims covered under XS–3672, and North River has done nothing to increase its indemnity payments under XS–3672 beyond those required by the policy. Together with Unigard's refusal to challenge any of the claims paid under XS–3672 following the North Shore audit, these factual findings compel the conclusion that Unigard must indemnify North River pursuant to the terms of the Certificate.

In addition, for the reasons set forth below, as a matter of law Unigard's right to associate and to notice do not overcome its obligation to "follow the fortunes" of North River.

### 3. North River's Consent to the Wellington Agreement Did Not Implicate Any of the Provisions of the Certificate

According to Unigard the "holy trinity" in handling insurance claims of "coverage, liability, and damages" gave it the right to associate in the decision to participate in the Wellington Agreement, because that decision involved the scope of coverage under XS–3672. Because it was not granted that right by adequate notice, Unigard contends that it is no longer required to "follow the fortunes" of North River. However, the right to associate clause of the Certificate provides that Unigard's right to associate relates to "the defense and control of any claim, suit or proceeding *which may involve this reinsurance.*" Absent specific language extending this right to include decisions "which may involve insurance underlying this reinsurance," the right to associate clause is not implicated by the decision to sign the Agreement.

While the Wellington Agreement might have initially appeared as though it would eventually involve coverage under XS–3672, as events unfolded there was in fact no effect on that coverage: none of the particular claims at issue here was held to be covered by reason of any provisions of the Agreement, although obviously the Agreement affected coverage of policies underlying XS–3672. Whether Unigard would have had a right to associate in the decision to sign the Wellington Agreement if the claims Unigard reinsured had been paid through the Facility is not a question which is before the Court. In any event, not only as a matter of fact but also as a matter of law, the Wellington Agreement did not operate to alter the coverage of the Certificate.

### a. North River Was Not Required to Issue Notice When It Signed the Wellington Agreement

Although North River might well have believed that the Wellington Agreement would eventually cover XS–3672, Uni-

gard has not established that the simple fact of signing the Agreement significantly increased North River's perception of the probability that the policy would be penetrated. The ECU's spring 1985 memo acknowledging that Owens–Corning's underlying layers might be eroded more quickly in the Facility than they would outside the Facility does not support the conclusion that on June 20, 1985 it appeared likely that the policy would be reached. At that time, there was still sufficient uncertainty concerning the true extent of Owens–Corning's liability and how the Facility itself might affect future claims that North River was not required to issue notice in 1985.[7]

■ However, the fact that North River's entry into the Agreement did not violate the specific terms of the Certificate does not end the inquiry. The relationship between a reinsurer and its ceding insurer, as that between any insurer and its insured, is characterized by the principles of *uberrima fides*, or utmost good faith. *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316, 48 S.Ct. 512, 513, 72 L.Ed. 895 (1928); *Hare & Chase, Inc. v. National Sur. Co.*, 60 F.2d 909, 911 (2d Cir.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 222, 77 L.Ed. 572 (1932). Therefore, North River's actions must be analyzed to determine whether North River violated this duty with respect to Unigard.

b. North River's Failure to Notify Unigard of Its Intent to Sign the Wellington Agreement Was Not Intentional

No evidence suggested that North River purposefully withheld information from Unigard or that its failure to consult with Unigard prior to signing the Wellington Agreement was the result of anything but inadvertence coupled with the complexities of the reinsurance industry.

While the facts set forth above establish that North River was not entitled to rely on Unigard's approval of other insurers' participation in the Agreement—because North River failed to show that it was even aware of that approval—Unigard has likewise failed to establish that North River had any reason to believe that Unigard was opposed its participation. Thus Unigard has not proven a motive for North River to have intentionally concealed its plans.

Moreover, although North River's and Crum & Forster's various communications to Unigard concerning the Agreement cannot be held to have constituted adequate notice relating to the Certificate, they are inconsistent with a conscious intent on North River's part to prevent Unigard from learning the truth. In particular, both the Killen Telex and Murphy's October 1984 letter to Murphy contained enough information for Unigard to have discovered the salient facts through its own investigation.[8]

■ However, even though North River's failure to notify Unigard was not intentional, North River might have violated the duty of utmost good faith if it inadvertently failed to disclose material information to its reinsurer. *See Hare & Chase, supra*, 60 F.2d at 912. As a matter of both fact and law, the risk was not materially altered by the Wellington Agreement.

c. Neither the Producer Allocation Scheme Nor the Use of the Triple Trigger Altered the Risk of the Certificate

According to Unigard, the Agreement's adoption of the producer allocation shares expanded Owens–Corning's liability, and the Facility's use of the triple trigger cov-

---

7. Moreover, even if notice should have been issued in 1985, Unigard's failure to demonstrate prejudice resulting from untimely notice, as discussed *infra*, would preclude it from escaping liability on the Certificate.

8. Also on the issue of good faith, Todd's response to Murphy, in which he neglected to seek

further identification of the agreement in question, must be considered in light of Todd's August 1984 memo suggesting that Unigard remain silent on its cedents' participation in the Wellington Agreement, so that it could later object to payments made through the Facility.

erage rule and initial coverage blocks increased the erosion of the insurance underlying XS–3672, thus accelerating the penetration of XS–3672. Unigard therefore asserts that North River's signing of the Agreement significantly altered the risk insured by XS–3672 and the Certificate, and that North River's failure to consult with Unigard prior to doing so excuses Unigard from paying on the Certificate.

While under the allocation formula Owens–Corning sometimes contributed to settlements of claims on which it might not legally have been liable, at the same time Owens–Corning benefitted from the fixed percentage contributions that other producers made to claims on which Owens–Corning would have been chiefly liable. The record does not contain any evidence to establish what portion, if any, of the coverage underlying XS–3672 was in fact exhausted as a result of the payment of claims that did not involve exposure to Owens–Corning's products or did not name Owens–Corning as a defendant.

In the coordinated *Asbestos Insurance Coverage Cases* in California State Superior Court, the Honorable Ira A. Brown, Jr. considered the fairness of the Wellington Agreement's percentage allocation formula. In his Phase IV decision, he pointed out that the formula "determines each producer's share on the basis of the producer's litigation experience," and concluded that "[a]lthough a producer pays on all claims, whether or not that producer is named in a particular claim, it is equally true that other producers pay on claims in which they are not named and thus pay a proportionate share of the named producer's liability." *Asbestos Ins. Coverage Cases* (Mealey's), Statement of Decision Concerning Phase IV Issues at 47 (Cal.Sup. San Francisco Co. Jan. 24, 1990).

Similarly, Unigard has not established that the Facility's adoption of the triple trigger rule of coverage and its use of initial coverage blocks in fact resulted in accelerated erosion of the layers underlying XS–3672. While the coverage trigger question may be very important in the context of a single claim or a single insurers' policies, the adoption of a broad coverage rule for handling a large number of claims covered by many insurers is less likely to have a significant impact on any one insurer's liability. As with the producer allocation formula, the adoption of a broad trigger might have caused some insurers to pay for claims which they would not have covered under narrower triggers, but at the same time guaranteed that rarely would one single insurer be liable for any claims on its own. There is simply no evidence indicating that under a narrower coverage rule the layers underlying XS–3672 would have paid out on fewer claims.

Moreover, at the time of the signing of the Agreement, it appeared likely that the triple trigger coverage rule would be applied to the asbestos claims against Owens–Corning. With respect to XS–3672, had there been a coverage action between North River and Owens–Corning the modern choice-of-law analysis would in all probability result in the application of the law of the state with the most significant relationship to the litigation. *See, e.g., Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 829 F.2d 227, 248 (1st Cir.1987) (Massachusetts choice of law requires application of Ohio substantive law); *Diamond Int'l Corp. v. Allstate Ins. Co.*, 712 F.2d 1498, 1501–02 (1st Cir.1983) (New Hampshire choice of law; New Hampshire substantive law); *Chesapeake Utils. Corp. v. American Home Assur. Co.*, 704 F.Supp. 551, 555–56 (D.Del.1989) (Delaware choice of law; multiple states' substantive law).

Throughout the relevant period, Owens–Corning had its headquarters in Toledo, Ohio. Under the "significant relationship analysis," it would therefore have been appropriate to apply the law of Ohio in any coverage action relating to Owens–Corning's insurance. In the mass tort context, the state where the insured is located has been held to be the state having the greatest interest in the application of its law concerning insurance coverage. *See Eagle-Picher, supra,* 829 F.2d at 248 (Ohio

law governs coverage question because Ohio is concerned with financial stability of Ohio company); *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C.Cir.1985) (Indiana law governs insurance trigger of coverage because of Indiana's interest in protecting its insured); *American Home Assur. Co. v. Libbey–Owens–Ford Co.*, 588 F.Supp. 764 (D.Mass.1984) (Ohio law governs because insured is Ohio corporation). Owens–Corning in fact has recently commenced a coverage action against many of its other insurers in Ohio state court seeking coverage for asbestos claims.

At the time the Wellington Agreement was signed, a federal court construing Ohio law predicted that the "triple trigger" would be applied by the court of Ohio. *Owens–Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 597 F.Supp. 1515, 1521 (D.D.C.1984). That prediction has proved accurate. *See Morton Thiokol, Inc. v. Aetna Cas. & Sur. Co.*, No. A–8603799, slip op. at 2 (Ohio Ct.C.P. Dec. 28, 1988) (order granting partial summary judgment on coverage trigger).

Therefore, Unigard has not shown that the Agreement's use of the producer allocation formula increased Owens–Corning's liability for asbestos bodily injuries, or that the Facility's adoption of the triple trigger constituted a deviation from the coverage rule which would otherwise have been applied to Owens–Corning's insurance policies, including those underlying XS–3672. Because Unigard—as the party seeking to avoid its contractual obligations—bears the burden of proving a breach, *see Neuwirth v. Blue Cross & Blue Shield*, 62 N.Y.2d 718, 476 N.Y.S.2d 814, 465 N.E.2d 353 (1984); *Facet Indus., Inc. v. Wright*, 62 N.Y.2d 769, 477 N.Y.S.2d 316, 465 N.E.2d 1252 (1984) (insurer seeking to avoid liability must show that claim falls within policy exclusion), its inability to establish that North River's signing of the Agreement constituted a material modification of the risk insured by XS–3672 prevents it from avoiding liability under the Certificate.

### 4. Unigard Cannot Escape Liability on the Grounds of Untimely Notice

According to Unigard, North River was obliged to give notice under the Certificate at a very early date, even predating the signing of the Wellington Agreement. As discussed above, there was nothing about the signing of the Agreement itself which required North River to issue notice. Unigard's contention is based on projections which Unigard claims should have been made, in light of the public disclosure of the number of asbestos claims made against Owens–Corning, and the projected settlement costs to resolve such claims. Unigard has urged prediction of involvement of XS–3672 years in advance by a simple arithmetic formula by which the average historical settlement amount is multiplied by the number of pending claims.

### a. Notice Was Not Required Prior to March, 1987

■ However, the shifting nature of the asbestos litigation crisis, the unknown effect of the Facility, and the complexity of the coverage issues between insurers and reinsurer establish that any such projection would have been too speculative to require notice at a time prior to the March 1987 Aetna exhaustion notice. As just one example, the allocation adjustment provision in the Agreement recognized that even the relative shares of liability among the producers could change with time as a function of the change in the occupational mix of claimants. Absent some particular identifying event, notice on a strictly arithmetic basis might have been required at the time of cancellation of the Owens–Corning business, a time when North River obviously concluded that that line of insurance might well turn out to be unprofitable.

More than a possibility is necessary in order to compel notice of a probable loss on a particular policy. The line between speculation and a reasonable inference must be marked by an objective fact linked to the policies at issue, such as the invasion of an underlying layer, or specific information of a claim or claims which are likely to reach

the policy in question. It cannot be delineated by the realization of an overall condition in an industry, divorced from an analysis of particular coverage considerations. Were it otherwise, notice would be meaningless, as Unigard could certainly have perceived just as well as North River that Owens–Corning's liability for asbestos bodily injuries was going to be extensive during the coverage period.

North River attempted to evaluate its potential exposure in 1986 when it requested information from the Facility. However, because of the Facility's concern for confidentiality, it was not until March of 1987, when news of Aetna's audit and consequent exhaustion of limits was known, that North River had objective evidence that its policy reinsured by Unigard would be involved.

### b. Notice Should Have Been Sent After the Aetna Exhaustion

When North River received notice from the Facility that the Aetna first-layer policy underlying XS–3619 had been exhausted, it then possessed sufficient information to determine that XS–3672 was likely to be reached. In fact, on April 1, 1987 Kirkner, as head of the department responsible for the timing of notices, suggested that notice be sent to the reinsurers of XS–3672. North River has presented no explanation as to why notice was not sent to Unigard at that time.

Whatever else might be said about North River's belief that XS–3672 would be reached, Kirkner's memo must be deemed an admission that as of that date the conditions for the issuance of notice under the Certificate had been satisfied.

### c. The Timeliness of Notice Must be Judged Under an Objective Standard

 In the event that a dispute arises over the timeliness of notice provided by a cedent to its reinsurer, the cedent's compliance with the notice provision must be measured by an objective standard. *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos.*, 748 F.2d 118, 121–22 (2d Cir.1984); *Jefferson Ins. Co. of N.Y. v. Fortress Re, Inc.*, 616 F.Supp. 874, 878–79 (S.D.N.Y.1984). Both Unigard's and North River's expert witnesses confirmed that the standard by which North River's conduct must be measured is an objective one.[9]

### d. Under an Objective Test, North River's Notice was Untimely

 At trial both parties relied on extensive expert testimony as to insurance and reinsurance custom and practice, in particular with respect to the nature of claim reserving and analyzing the exposure to excess insurance policies posed by asbestos claims. This testimony established that most facets of the insurance and reinsurance industries have more than one custom and practice, and it is not unusual for two people, each with a great deal of experience, to have different views on the matter.

Indeed, as this litigation amply demonstrates, custom and practice has changed significantly since 1974 when the Certificate was issued, primarily due to the overwhelming pressures of asbestos litigation. The relationship between ceding companies and reinsurers has become more arm's length than it was in the past, and increased insistence by reinsurers on close compliance with contractual notice requirements is a natural concomitant of this separation.

North River's own expert testified that it was customary for notice to be sent to a reinsurer anywhere between several weeks and six months after the notice provision had been triggered, depending on the circumstances. In light of all the circumstances presented here, including the amount of money involved, the unexpected nature of Aetna's notice of exhaustion, which deprived North River of the opportunity to monitor the rate of erosion of Aetna's policy and predict how long it might take before the second-layer excess was

---

**9.** Although North River's expert stated that standard should be subjective, his description of the test, based on reasonableness, clearly indicated an objective one.

exhausted, and North River's conclusion as of April 1, 1987 that XS–3672's reinsurers should be notified, the delay of five months before such notice was received by Unigard must be considered untimely.

### e. Unigard's Inability to Show Prejudice from North River's Late Notice Prevents it From Escaping Liability

The parties dispute whether New York law requires a reinsurer to demonstrate prejudice in order to assert a late notice defense successfully. The starting point for this inquiry is "the ordinary requirement of contract law that one seeking to escape obligations demonstrate material breach or prejudice arising from the allegedly inadequate notice given." July Opinion at 25–26 (citing *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392, 366 N.E.2d 1313, 397 N.Y.S.2d 958 (1977) and *American Power Indus., Ltd. v. Rebel Realty Corp.*, 145 A.D.2d 454, 535 N.Y. S.2d 99 (2d Dep't 1988); *see also Insurance Co. of the State of Pennsylvania v. Associated Int'l Ins. Co.*, 922 F.2d 516, 523–24 (*"Associated"*) ("absent a clear and unambiguous expression by the parties to a reinsurance contract that they intended the notice provision to be a condition precedent, the provision will not be" so construed); *Security Mut. Cas. Co. v. Century Cas. Co.*, 531 F.2d 974, 976 (10th Cir.) ("stipulations for notice will not be construed as conditions precedent if reasonably open to other construction.") (quoting G. Couch, *Cyclopedia of Insurance Law* § 49:20 (2d ed. 1982)), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

### i. The "no prejudice" rule in the insurance context

Both parties agree that, in the direct insurance context, New York courts have created a limited exception to this ordinary requirement of contract law and have held that timely notice under an insurance contract is a condition precedent to coverage. The reason for this rule that an insurer need not prove prejudice, as discussed in the findings of fact above, is the insurer's need to conduct an investigation while the evidence is fresh in order to prevent fraud and its obligation to defend the insured against the claim. *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir. 1987); *Utica Mut. Ins. Co., supra*, 748 F.2d at 121; *Power Authority of N.Y. v. Westinghouse Elec. Corp.*, 117 A.D.2d 336, 339, 502 N.Y.S.2d 420, 422 (1st Dep't 1986).

### ii. The different needs of insurers and reinsurers justify applying a different rule in the reinsurance context

However, the purpose of notice to a reinsurer, also discussed earlier, is to allow the reinsurer to post reserves, to allow it to associate in the resolution of the underlying claims, and to enable it to determine under what conditions it wishes to renew the reinsurance coverage.

A comparison of the needs of direct insurers and reinsurers indicates that only an insurer faces irreparable harm from untimely notice of a claim. If the claim is fraudulent, the insurer may be unable to collect evidence of the fraud, and thus may have no basis to avoid paying the claim. If the insurer is unable to provide for the defense of the insured, both the insured and the insurer may be damaged by an incautious admission, an ill-advised settlement, or an adverse legal outcome. In either case, the harm to the insurer is difficult to measure and may even be impossible to prove.

By contrast, the risks to a reinsurer of untimely notice are not irreparable. With respect to the inability to post reserves in a timely fashion, the reinsurer will generally have some evidence that it would have posted reserves earlier and some proof as to how its inability to do so has damaged it. As for renewal of the reinsurance, the reinsurer can present evidence that given timely notice and based on information which it possessed at that time, it would have increased the price or determined that the reinsurance should be terminated. Finally, while a reinsurer may have difficulty establishing damages arising from an inability to associate in the resolution of the underlying claim, it is important to note that the

right to associate is not a right of control, and under the "follow the fortunes" doctrine, the mere fact that a reinsurer might have disagreed with its cedent's handling of the claim does not permit it to avoid liability on the reinsurance agreement.

In addition to the fact that harm to a reinsurer is more easily established, the resulting damages are more easily quantified. For example, if the reinsurer would have terminated the reinsurance rather than renewed it, the proper remedy might be rescission of the renewal. If it was unable to post reserves at the appropriate time, it might be entitled to collect money damages or be relieved of liability under the agreement.

Therefore, reinsurers simply do not face the type of irreparable harm which threatens direct insurers in case of untimely notice of a claim. Thus there is ample foundation for North River's proposition that the "no prejudice" rule should not be applied in the context of notice from a cedent to its reinsurer.[10]

As discussed in the July Opinion, the only New York State court which has considered this issue concluded that a reinsurer cannot avoid its coverage obligation on the ground of late notice absent a showing of prejudice. *Generali, supra,* slip op. at 7. Unigard here attempts to distinguish that case on the grounds that it involved a property risk, rather than a casualty risk, and the direct insurer therefore had no duty to defend the claim. While this distinction might be relevant in analyzing the need for timely notice to the direct insurer, who nevertheless is vulnerable to fraud (*e.g.,* arson), it in fact undercuts Unigard's argument here, by suggesting that where there is less risk of irreparable harm because of late notice the "no prejudice" rule is unwarranted.

Based in part on the analysis contained in the July Opinion, the Honorable Peter K.

Leisure also concluded that a reinsurer must show prejudice under New York law to prevail on a late notice defense. *Christiana General Ins. Corp. v. Great Amer. Ins. Co.,* 745 F.Supp. 150, 158–59 (S.D.N.Y. 1990), *rearg. denied,* 1990 WL 212950 (S.D. N.Y. Dec. 17, 1990). In *Associated, supra,* the Ninth Circuit followed the reasoning of *Christiana* and held that under California law a reinsurer must show prejudice to establish a late notice defense. According to Unigard, the "rationale" of *Christiana* is "undercut" by *Olin & Corporation v. Insurance Co. of N. Am.,* 743 F.Supp. 1044 (S.D.N.Y.1990). However, as Judge Leisure made clear in denying reargument in *Christiana, Olin* had nothing to do with the timeliness of notification to reinsurers, but rather dealt with the issue of notice to direct primary and excess insurers. While the excess insurers there may not have been obliged to defend the claims, the relevant issue was timely notice by the primary insured, without which both the primary and excess insurers might suffer irreparable harm. *See Christiana,* 1990 WL 212950 at 2.

iii. Unigard has not shown prejudice from North River's untimely notice

■ Unigard has presented no evidence that it was damaged by North River's untimely notice—a notice which was untimely by at most a few months. By 1987, Unigard was no longer in the reinsurance business, thus it had no need to evaluate the cost of renewing the reinsurance at issue. The fact that Unigard has not yet posted any reserves under the Certificate compels the conclusion that it suffered no damage from not doing so prior to September 2, 1987. The notice from North River was received at least one year prior to the time at which any claims were settled under XS–3672, giving Unigard more than enough time to participate in any settle-

10. Unigard argues that the application of the stricter rule to the insurer-insured relationship, in which the insured may be unsophisticated and unaware of the requirement of timeliness, than to the cedent-reinsurer relationship, in which both parties are expected to be familiar

with the need for timeliness, is patently unfair. However, this argument simply ignores the fact that the insurer's need for timely notice is much more urgent than is the reinsurer's, and that the only protection for the insurer is the strict "no prejudice" rule.

ment. After an audit of all the claims paid under the policy Unigard has made no effort to challenge any of the settlements. There thus has been no showing of any facts which establish prejudice to Unigard, and the untimely notice from North River will therefore not permit it to escape it liability on the Certificate.

### 5. Under the Following Form Clause Unigard Must Pay Expenses in Excess of the Limits of the Certificate

■ Unigard, relying primarily on *Bellefonte, supra,* contends that it is not obligated to pay defense costs in excess of the limits stated in the Certificate. In *Bellefonte,* the ceding insurer, Aetna, had initially begun litigation with its insured to determine whether it owed expenses in addition to its policy limits. That litigation was settled with Aetna agreeing to pay expenses in addition to the policy limits. When Aetna subsequently sought reimbursement for these payments from its reinsurers, the reinsurers refused.

The Second Circuit rejected Aetna's claim that the "follow the fortunes" doctrine required the reinsurers to pay the expenses in addition to the limits of their reinsurance agreements, commenting that

> To read the reinsurance certificates in this case as Aetna suggests—allowing the "follow the fortunes" clause to override the limitation on liability—would strip the limitation clause and other conditions of all meaning; the reinsurer would be obliged merely to reimburse the insurer for any and all funds paid. Such a reading would be contrary to the parties' express agreement and to the settled law of contract interpretation.

903 F.2d at 913.

In other words, the *Bellefonte* court held that the reinsurers' obligation to abide by the insurer's good faith resolution of disputes was limited by the liability limits of the reinsurance agreements. If the insurer in good faith agreed to a settlement which exceeded the limits of the underlying policy, it could not rely on its own good faith to compel the reinsurers to pay beyond their limits as well.

However, North River does not seek to hold Unigard liable for expenses under the "follow the fortunes" clause of the Certificate, but rather under its "following form" clause. There is no question here as to whether North River's payment of expenses in excess of the policy limits was done in good faith: North River was obligated to do so by the arbitration of July 1989. As that arbitration established that such expenses were required by the terms of North River's policy with Owens–Corning, the "following form" clause requires Unigard to pay its share of those expenses under the Certificate.[11]

After rejecting Aetna's "follow the fortunes" argument, the *Bellefonte* court analyzed the language of the policies at issue and concluded that the parties never intended that the reinsurance agreements in issue required payment of expenses in excess of the policy limits: "The reinsurers are liable only to the extent of the risk they agreed to reinsure. They cannot be liable for the insurer's action in excess of the agreement." 903 F.2d at 914. Under *Bellefonte,* therefore, Unigard is liable "to the extent of the risk [it] agreed to insure." Therefore, its intent when it drafted and signed the Certificate is controlling.

The evidence at trial established that prior to the lower court decision which was affirmed in *Bellefonte,* Unigard interpreted its standard form facultative certificate to require payment of expenses in addition to the indemnity limit whenever the policy reinsured did so. Indeed, Unigard consistently paid claims on that basis when submitted under this type of facultative certificate. Moreover, this interpretation was

---

11. By contrast, the Aetna dispute with its insured was resolved by Aetna's voluntary agreement to amend the policies in question by increasing the liability limits to allow for recovery of expenses by the insured. *Penn Re, Inc. v. Aetna Cas. and Sur. Co.,* No. 85–385–5, slip op. at 6–8 (E.D.N.C. June 24, 1987) (case relating to same dispute as *Bellefonte* ).

shown to be consistent with the customs and practice of the industry.[12]

Among the terms of XS–3672 that are incorporated by reference into the Certificate are the provisions that determine whether defense costs are payable and, if so, whether they are payable only within policy limits or in excess of those limits. The coverages of the Certificate are thus largely defined by the underlying insurance terms, and the "reinsurance accepted" in the Certificate is the functional counterpart of the policy limits of XS–3672. Accordingly, the Certificate must reasonably be interpreted to pay defense costs in addition to the limit of "reinsurance accepted" in the same way that XS–3672 is required to pay defense costs in addition to its policy limits.

### 6. Unigard Owes the Full Payment for the Policy Period on XS–3672(A)

Unigard claims that because the initial policy period XS–3672(A) was only 3½ months long, rather than a full year, the aggregate policy limit for XS–3672, and thus the corresponding limit on the Certificate, must be prorated. Unigard bases this argument on language in the underlying insurance policies which stated that the aggregate limits were "for each annual period where applicable." However, there was no provision in the policy which suggested how an aggregate limit was to be treated where the policy period was less than a full year. Based on the testimony of Unigard's own expert, the custom and practice of the insurance industry, and common sense the proration argument must be rejected.

Under Ohio law—which, as discussed above, would most likely be applied in a coverage dispute between Owens–Corning and North River—all of Owens–Corning's asbestos losses constitute a single occurrence. *Owens–Illinois, Inc. v. Aetna Cas. & Sur. Co., supra,* 597 F.Supp. at 1528; *Morton Thiokol, supra,* slip op. at 1. In addition, both parties' experts agreed that

full limits would be available under XS–3672(A) for a single occurrence. Therefore there is simply no dispute that North River's payment of full limits under XS–3672(A) is appropriate, and that Unigard owes reinsurance on the same non-prorated basis.

Even if Owens–Corning's asbestos losses did not constitute a single occurrence, logic would dictate that the full limit must be available during the shortened stub period, because it would not make sense for the aggregate limit to be less than the occurrence limit. The purpose of having an aggregate limit in addition to an occurrence limit is to cap the indemnity payments made in a given policy period regardless of the number of occurrences. Because the aggregate limit thus protects against repeated occurrences, the aggregate limit could never be less than the single occurrence limit. Unigard's expert conceded this principle. Therefore, as both the aggregate and occurrence limits for XS–3672(A) are $30 million, there can be no proration of the aggregate limit during that period.

Although not necessarily controlling, Judge Brown's decision on the proration issue in the coordinated *Asbestos Insurance Coverage Cases, supra,* is also informative:

> Since proration of annual aggregate limits would reduce coverage, the burden of proof is on the insurers to show that the limits should be prorated. However, the result would be the same even if the burden of proof were on the policyholders.
>
> Nothing in the plain language of the policies provides for proration of annual aggregate limits where the policy is in effect for a fraction of a year. The policy language describes the consequences of cancellation; it reduces the period of coverage and reduces the premium paid by the policyholder. There is no provision for the reduction of aggre-

---

**12.** Also relevant in this respect is the fact that Unigard accepted one-sixth of the premiums paid under XS–3672, less the standard reinsurance brokerage fee. If the agreement had been intended to cover only one-sixth of North River's indemnity losses, with no payment of expenses in excess of the limits, then it would seem that Unigard was being overpaid for its services.

gate limits in the event of cancellation. The insurers could have stated plainly that aggregate limits are to be prorated in the event of cancellation, but failed to do so.

. . . .

The insurers have asserted that it would be unfair or inequitable for the policyholders to receive full aggregate limits while only paying premiums for a fraction of a year. However, both the insurers and the policyholders received the benefit of their bargain. In exchange for a reduction in premiums, the insurers received an equivalent reduction in the amount of time the insurer was on the risk.

*Asbestos Ins. Coverage Cases* (Mealey's), *supra*, Statement of Decision Concerning Phase IV Issues at 6–7 (citation omitted). As Judge Brown concludes, the premium is prorated, but this proration reflects the shortened length of time for which the insurer is exposed to the risk of loss, not a reduced quantum of protection available if the risk materializes in the stub period, however short it may be.

## CONCLUSION

For all of the foregoing reasons, North River has established that Unigard must comply with the "follow the fortunes" provision of the Certificate, Unigard having failed to prove that the right to associate of notice provisions are pre-eminent or were violated. Unigard is also liable for one-sixth of North River's payments under policy XS–3672 including all expense costs in excess of the policy limits and for the stub policy period XS–3672(A) to the full extent of the policy limits without proration.

Settle judgment on notice.

It is so ordered.